**Edward C. BENDER, Appellant,**

v.

**Judy A. BENDER, Appellee.**

Superior Court of Pennsylvania.

Submitted May 11, 1998.

Filed July 7, 1998.

James Pappas, Johnstown, for appellant.

Roger D. McGill, Ebensburg, for appellee.

Barbara A. Romani, Ebensburg, for participating party.

Before HUDOCK, ORIE MELVIN and HESTER, JJ.

HESTER, Senior Judge:

Edward C. Bender appeals from the December 8, 1997 order entered in the Cambria County Court of Common Pleas after the court determined appellant had breached his contractual duty to pay for the educational expenses of his daughter, Paula Bender. The court ordered appellant to comply with his obligation and to reimburse Paula's trust in the amount of $4,407.88. We affirm.

Appellant and his ex-wife, Judy A. Bender, appellee, entered into a Marriage Settlement Agreement (MSA) on May 21, 1986, pursuant to their divorce action. The M.S.A. is a comprehensive legal document that details the divorce action, encompassing areas such as child support and visitation, alimony for appellee, medical insurance for appellee and the dependent children, and equitable distri-

bution of the marital assets. In particular, the M.S.A. created a contractual duty on behalf of appellant to pay for the undergraduate college expenses of his children and set up a trust fund for each child. When Paula Bender, the oldest of the three Bender children, attained her eighteen birthday, she requested that her father assume his contractual duty and pay for her college expenses. When appellant refused, Judy Bender, appellee, filed a petition to enforce the pertinent provisions of the MSA, and Paula Bender, intervenor-appellee, filed a petition to intervene. The court granted Paula's petition to intervene on October 13, 1997, and a hearing on the petition to enforce was field on October 21, 1997.

For purposes of this action, the relevant portions of the M.S.A. are provisions one, two, four, and twenty-two which state (emphasis added):

1. Husband agrees to pay Wife, for the use, benefit, support and maintenance of the children, the sum of Two Hundred Fifty and 00/100 ($250.00) Dollars per month per child, which payments shall continue in that amount until the child reaches the age of eighteen (18). At that time, the support payments for that particular child shall terminate.[1]

2. Husband agrees to *be solely responsible for the reasonable cost of undergraduate college tuition for all of the children, including but not limited to the following: tuition, room, books, board, supplies, fees, transportation, and clothing.*

. . . .

4. *In addition to the foregoing,* Husband agrees to establish, within twenty (20) days following the entry of a divorce decree divorcing the parties, a trust for each child. Each trust shall be sufficiently funded so as to contain a principal balance of no less than Eighty Thousand Dollars per trust by the time the beneficiary reaches age

eighteen (18). If the principal balance in any trust is less than Eighty Thousand and 00/100 ($80,000) Dollars on the beneficiary's eighteenth birthday, Husband will pay sufficient funds to the principal in order to correct the deficiency. The beneficiary shall not be entitled to distribution of his or her particular trust until he or she reaches age twenty-five (25). The trustee may, however, distribute such principal and income to the beneficiary following the beneficiary's eighteenth birthday, as the trustee, in his sole discretion, deems necessary for the welfare of the beneficiary. Husband or his designee shall serve as the beneficiary for each trust.

. . . .

22. *This Agreement contains the entire agreement between the parties* as to the claims related to the contemplated divorce action and separation of the parties. Any oral representations or *modifications concerning this Agreement shall be of no force or effect unless such modification is in writing and signed by both parties.*

Emphasis added to original.

The divorce decree was entered on September 26, 1986. It incorporated the M.S.A. by reference with the following addendum to the order:

All ancillary issues have been resolved by a Marriage Settlement Agreement dated May 21, 1986, a copy of which is attached hereto as an Exhibit, which is hereby approved by the Court and made a part of this Order by reference. The provisions of the Marriage Settlement Agreement shall be enforceable as if they arose from an original court order.

On October 2, 1986, after the divorce was final, appellant executed the Deed of Trust for Paula which in pertinent part provides:

The Trustee shall hold the principal of the Trust for the benefit of the Grantor's daughter, PAULA ANN BENDER, and

---

1. The original support provision in the M.S.A. twice was amended regarding child custody and monthly child support payments. As required by clause twenty-two of the MSA, the changes were executed with the consent and signatures of both parties. The resulting monthly support at the time of this action was $600.00 per month, per child.

until she has attained the age of twenty-five (25) years, shall pay for her benefit so much of the net income and principal as the Trustee, in its sole discretion, deems advisable for her welfare, comfort, and education. Any net income not so paid shall be added to the principal of the Trust. Deed of Trust, 10/2/86, Article I A. The Deed of Trust was neither signed nor witnessed by Judy A. Bender, appellee. Moreover, there is no language in the document which incorporates it by reference to the divorce decree. Likewise, the trust is not incorporated into the final divorce order. Finally, it contains no language indicating that it is to serve as an amendment of any existing document which relates to the parties' divorce.

During her senior year in high school, Paula A. Bender, intervenor-appellee and daughter of appellant, consulted with her high school guidance counselor in order to choose an appropriate college. Paula utilized the resources in her school's guidance office, talked to people whom she respected and admired, and decided to attend Juniata College where she would study psychology. Paula chose Juniata College for its fine reputation in her intended field of concentration, its high job placement rate for graduates, its small size, and because she knew people who currently or previously attended Juniata College including her priest, her school principal, and her boyfriend. Notes of Testimony ("N.T."), 10/21/97, at 22. Since Paula always had attended small, Catholic schools and since the institution had a strong reputation, she felt that it would make a good choice. *Id.* at 25.

Prior to committing to attendance there, Paula discussed the school with appellant. She explained that the annual college tuition of 22,000.00 would be offset by the $5,000.00 academic scholarship she had been offered, plus $3,000.00 in financial aid. The tuition remaining, $14,420.00, would be payable to Juniata College in monthly installments of $1,872.00. In February, 1997, appellant gave Paula $200.00 cash for her college registration fee. *Id.* at 15–19. However, when Paula asked appellant to pay for her college tuition, he made it clear that she would have to draw from her trust fund in order to attend. Paula read the MSA, understood it to obligate appellant to pay for her college expenses in addition to funding a trust, and contacted appellant again. Appellant counter-offered Paula $600.00 per month toward the cost of her tuition, the identical amount which he had been paying in monthly child support payments, and directed her to withdraw the remainder from her trust. *Id.* at 25, 33. Paula refused, and this litigation ensued.

At the October 21, 1997 hearing held on the petition to compel appellant to provide for Paula's educational expenses, appellant conceded that Paula had told him she intended to enroll in Juniata College as a freshman. *Id.* at 32. He had no objection to Paula's choice of Juniata College. *Id.* at 30. However, appellant testified that he intended the trust fund to pay for Paula's educational expenses. Appellant stated that if the court ordered him to pay for Paula's college expenses, he would want some control over the college she chose. Appellant admitted that he had not taken an active role regarding Paula's education, having rarely attended any conferences or events with the exception of graduation.

The trial court concluded that the M.S.A. was a clear, unambiguous contract that obligated appellant to pay for Paula's college expenses *and* create a separate and distinct trust fund for her. Moreover, the court concluded that the M.S.A. represented a *final* agreement between the parties. Finally, the court did not accept appellant's premise that the language in the deed of trust amended his obligation. The court entered an order compelling appellant to pay for his daughter's educational expenses and to reimburse her trust for the amount she had been forced to withdraw to pay for her educational expenses. This appeal followed.

Appellant presents two issues for review.

I. Whether the trial court erred in finding that the Father was responsible for his daughter, Paula Bender's college costs out of his personal income and not out of the trust he had established in accordance with the Marriage Settlement Agreement?

II. Whether the trial court erred in failing to determine whether or not the costs claimed by Paula Bender were "reasonable" and therefore payable by the Father?

Appellant's brief at 4.

First, appellant argues that he is not responsible to pay for Paula's undergraduate education costs out of his personal income. Appellant maintains that the trust fund that he created as per the M.S.A. would provide for those expenses. Specifically, he refers to the language in the deed of trust that provides that it is to be used for Paula's educational expenses. He urges that in reviewing this issue, we consider both the M.S.A. and the deed of trust in order to ascertain the intent of the parties.

The law of contracts in Pennsylvania is well settled. "[T]he intent of the parties to a written contract is to be regarded as being embodied in the writing itself, and when the words are clear and unambiguous the intent is to be discovered only from the express language of the agreement." *Steuart v. McChesney*, 498 Pa. 45, 444 A.2d 659, 661 (1982). This plain meaning approach is used where the language of a document is clear and there is no need of interpretation by reference to extrinsic evidence. *Id.* We look beyond the four corners of a document only where the intent of the parties is not clear.

The evidence reveals that the M.S.A. is a clear, specific, and unambiguous document which represents a final agreement between Edward and Judy Bender. The document created an affirmative obligation for appellant to pay Paula's educational expenses and those of his other children. *In addition*, it provided that appellant must create trusts for Paula and his other children. Moreover, it provided that no amendments to the agreement were permitted without the consent of both parties as evidenced by their signatures.

There is *no* language which supports appellant's contention that the legal obligations created in provisions two and four of the M.S.A. are reciprocal, thereby permitting the

trust fund to serve as the vehicle from where appellant's contractual obligation to pay for Paula's educational expenses would be satisfied. To the contrary, the language which creates appellant's obligation to fund the trust is specific in that the trust is to be established in addition to appellant's obligation to pay for college. Therefore, since appellant's purported interpretation of the M.S.A. is directly contrary to the specific, unambiguous language professed in the document, there is no support for appellant's position. Further, there is no amendment to the MSA, signed by the parties, which would permit appellant to amend the contractual obligations at issue. Appellant agreed to pay for the educational expenses of his children *and* to create trust funds for his children. Any withdrawals from the trust to pay for educational expenses would be contrary to the clear intent of the MSA.

Appellant also argues that the trial court erred when it failed to make a determination as to whether the educational expenses which Paula would incur at Juniata College were reasonable. He asserts that Paula failed to "consider or discuss with [him], the great cost involved." Appellant's brief at 13. Appellant opines that Paula chose Juniata College to be near to her boyfriend and failed to explore alternative colleges. Appellant suggests that the costs are not reasonable and urges that we either reverse the trial court's determination or remand for an evidentiary determination of reasonable costs.

Preliminarily, we note that the record does not support appellant's disparaging version of Paula's testimony. It is clear from the transcript that Paula tried to discuss her choice of college with appellant.[2] In fact, appellant conceded that Paula did inform him that she intended to enroll at Juniata College. Paula researched Juniata College and other options through her high school guidance counselor and made an educated decision based upon her future career goals. Moreover, appellant's contention that the trial court made no determination as to wheth-

---

2. Unfortunately, Paula perceived that her relationship with her father had begun to deteriorate. Despite a desire to spend time with appellant, Paula felt as though she and her brothers were not able to see him as much as they wanted since he had re-married and started another family. N.T., 10/21/97, at 21.

er the costs of Paula's education were reasonable is false. In fact, the court observed that the issue of reasonableness did not "excite him" since Paula had researched her options and made efforts to mitigate the cost of tuition by obtaining scholarships and financial assistance. N.T., 10/21/97, at 56. Clearly, we can infer that the trial court concluded Paula's educational expenses were reasonable.

Moreover, appellant interfered with the trial court's ability to make a more thorough finding of reasonableness, and we see no reason to grant him a second bite at the apple. Specifically, counsel for appellant objected when appellee and appellee-intervenor attempted to explore appellant's assets and income in order to establish that the cost of tuition was not unreasonable given appellant's financial status. Appellant's counsel objected to mother's repeated attempts to establish appellant's income with vehement opposition to any reference to appellant's income being placed on record. Counsel argued that his client's ability to pay was not the subject of the proceeding. Rather, "[the o]nly issue raised is a question of the—her spending the money without consulting my client and the reasonableness of her expense. My client's income is not relevant here today." N.T., 10/21/97, at 50. Since the M.S.A. does not empower appellant with decision-making authority regarding his children's choice of college, this argument is without foundation. Finally, the generous property disbursements in the M.S.A. lead to the inexorable conclusion that appellant is a man of substantial financial standing who would be capable of paying the tuition proposed.

Order affirmed.